**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**MAERSK LINE, LIMITED,**

       **Plaintiff,**

     **v.**                           **ACTION NO. 2:05cv747**

**UNITED STATES OF AMERICA,**

       **Defendant.**

## OPINION AND FINAL ORDER

This matter comes before the court on Plaintiff Maersk Line, Limited's Motion for Summary Judgment and Defendant United States' Motion for Summary Judgment. For the reasons set forth herein, the court **DENIES** the United States' Motion for Summary Judgment and **GRANTS** Maersk Line, Limited's Motion for Summary Judgment.

## I.  Factual and Procedural History

### A.  Facts Not In Dispute[1]

This controversy arises from the transport of seven Halversen aircraft loaders ("K-Loaders") by Maersk Line, Limited ("Maersk") from Charleston, South Carolina, to Thumrait, Oman, pursuant to the Universal Services Contract, DAMT01-03-D-0124 ("USC-04"). The USC-04 is a standard form contract that the Military Surface Deployment and Distribution Command ("SDDC"), on behalf of the United States, offers to some fifteen carriers, including Maersk. Under the USC-

---

[1] The following facts are taken from the Joint Stipulation of Facts Not in Dispute, filed August 9, 2006, and the uncontested Declaration of Anthony Nowotarski, Maersk Line, Limited's Senior Director, filed August 23, 2006.

04, various Department of Defense agencies may coordinate with the SDDC to ship cargo overseas.

On April 30, 2003, the SDDC offered the movement of the seven K-Loaders from Charleston to Thumrait.[2]  Maersk accepted the booking on May 1, 2003.  The booking was accomplished over the Internet through an electronic data interchange system called the Integrated Booking System ("IBS").

Pursuant to Clause 4.1.8 of the USC-04, the parties' contract consisted of the following documents in order of priority: (1) the USC-04; (2) the Transportation Control and Movement Document ("TCMD") and other shipping instructions; and (3) booking documents.  The TCMD, issued by the SDDC, provided shipping instructions and was the only document received by Maersk that provided such instructions.  The booking documents set the applicable freight rates, terms, and conditions for a particular shipment.  Clause 3.1 of the USC-04 expressly incorporates the Carriage of Goods By Sea Act ("COGSA"), 46 U.S.C. app. §§ 1300-1315, into the parties' contract.

The K-Loaders were delivered to Maersk at Charleston on April 28 and 29, 2003. Either Maersk or its agents, employees, or contractors loaded each K-Loader onto a flat rack in preparation

---

[2]More specifically, the SDDC offered the movement of the K-Loaders as "'Heavy Vehicles' pursuant to 'Table 2A (Outbound)' ocean breakbulk/RORO liner terms - Route 07 - U.S. East Coast to Arabian Sea range."

for ocean shipment.  On May 10, 2003, the K-Loaders were loaded into the MAERSK MISSOURI, which departed Charleston that same day and arrived in Salalah, Oman, on May 22, 2003.  The K-Loaders were then transported by truck to Thumrait.  Maersk did not provide a bill of lading to the SDDC until October 21, 2004.

One K-Loader affixed to a flat rack ("the K-Loader") sustained damages during the ocean voyage to Oman, and cost $31,279.60 to repair.  The SDDC contacted Maersk regarding the damages during the summer of 2003.  Maersk acknowledged the claim but asserted, in a letter dated August 20, 2003, that its total liability was limited to $500 per K-Loader pursuant to COGSA.  The SDDC demanded payment of the full cost of repairs.  On December 21, 2004, an SDDC contracting officer issued a "final decision," stating (1) that the K-Loaders were not "shipped in packages" within the meaning of COGSA, and (2) that the $500 limitation on liability under COGSA should, therefore, apply per measurement ton of cargo. Accordingly, the final decision calculated Maersk's liability as $26,312.50 (56.625 tons x $500.00 per measurement ton).  The SDDC subsequently offset $26,359.30 (the original $26,312.50 plus $46.80 in interest) against amounts due Maersk.  Neither COGSA nor the USC-04 defines the term "package."

**B.    Additional Details Regarding The Parties' Contract**

In support of its Motion for Summary Judgment, Maersk provided additional information about the parties' contract, as evidenced by the USC-04, TCMD, and booking documents, by submitting the following to the court: (1) a copy of the USC-04, (2) the declaration of Anthony Nowotarski ("Nowotarski"), Maersk's Senior Director, Military and Military Household Goods, dated August 17, 2006, and (3) the declaration of Jerry Nelson ("Nelson"), Maersk's Claims Manager, dated August 17, 2006.  Except where noted, the information set forth below is not in dispute.

**1.    The USC-04**

The USC-04 refers to two classes of cargo: breakbulk/RORO cargo and container cargo.  It defines "Breakbulk/RORO Cargo" as "[a]ll cargo that is not containerized."  The USC-04 sets forth rules for determining the appropriate freight rates for each type of cargo.  Section A-1 of the USC-04, for example, states that cargo "shipped in FLATRACK containers shall be freighted at the General Cargo container rate."  It further provides that a "lump sum flatrack surcharge" will be added to the total freight charge for such cargo.  The USC-04 defines "Flatrack (Platform) Container" as "a container without weatherproof sides and/or top."  Section A-2 of the USC-04 specifies that breakbulk/RORO cargo shall be freighted per measurement ton.

In addition, Clause 3.1 of the USC-04 provides that "[f]or the

purpose of interpreting Section 4 of the [Carriage of Goods by Sea Act] 'Limitation of Liability' a container shall not be considered one package.  The limitation of liability set out in Section 4 of the Act shall apply to each package, and for cargo not in packages to each measurement ton of cargo."

## 2.   Nowotarski Declaration

Nowotarski asserts that a review of the USC-04, TCMD, and booking documents "shows that the parties intended each K-Loader, mounted on a flat-rack, to be a single packaged unit."  He further asserts that the K-Loader was not a container within the meaning of Clause 3.1 of the USC-04.  Although the United States has contested his assertions, it has not contested the facts underlying them. The uncontested facts set forth by Nowotarski are listed below.

- The TCMD provides a single Transportation Control Number ("TCN") for each K-Loader.

- Column 9 of the TCMD describes the K-Loader as "9.Pack VE."  Pack refers to "package," while VE refers to "vehicle."  Column 39 of the TCMD similarly refers to the K-Loader as "Type PACK VE," meaning "Type of Package: Vehicle").

- In the booking documents, each K-Loader is designated by its respective TCN.  The K-Loader is referred to under the heading "Commodity Cd: 891 - Vehicles for Airfield Terminal," as "Package Cd: VE-Vehicle."

- In the remarks section of the booking documents, the SDDC stated "UNIT PACKAGED TO PREVENT DRIVING ON-OFF VESSEL."

- The K-Loader was offered and booked for shipment under the 'breakbulk/RORO' liner terms of the USC-04.

- The SDDC neither paid freight charges on a container basis nor paid any of the surcharges that normally would

5

accompany containerized shipments.

- Although the bill of lading issued for shipment was not part of the contract of carriage, it uses headings that refer to "Kind of Packages" and "No. of Containers or Pkgs."

### 3.   **Nelson Declaration**

Nelson lays the foundation for photographs of the K-Loader. The photographs were taken after the K-Loader arrived in Oman. The photographs show the K-Loader affixed to a flat rack. It is clear from the photographs that the flat rack does not completely cover, or even substantially cover, the K-Loader.

## C.   **Procedural History**

On December 21, 2005, Maersk filed a complaint against the United States. In its complaint, Maersk alleges that the United States' offset of amounts due Maersk under the USC-04 was "wrongful and/or a breach of contract." On February 14, 2006, the United States filed an answer. On March 8, 2006, a Rule 16(b) conference was held, and a bench trial was scheduled for September 19, 2006. On August 9, 2006, the parties filed a Joint Stipulation of Facts Not in Dispute.

The United States filed a Motion for Summary Judgment on August 23, 2006. Maersk filed a Motion for Summary Judgment on August 24, 2006. On September 5, 2006, each party submitted a memorandum in response to the other party's Motion for Summary Judgment. Maersk submitted a reply to the United States' response on September 12, 2006. The United States submitted a reply to

Maersk's response on September 14, 2006.  The parties agreed that the case should be disposed of through summary judgment, as no material facts were in dispute.

The court conducted a hearing on the motions for summary judgment on September 19, 2006.  At that hearing, the United States made additional arguments that it had not presented in any of the three briefs it had filed prior to the hearing.[3]  On September 27, 2006, the court ordered Maersk to submit a supplemental brief to address the new arguments.  On October 12, 2006, Maersk submitted a supplemental brief in further support of its motion for summary judgment.  The United States submitted a response on October 17, 2006.  Maersk submitted a late reply to that response on October 24, 2006.[4]  The matter is ripe for decision.

## II.  Relevant Statutory Provisions

This court has explained that COGSA has "as a principal purpose the elimination of adhesion contracts, foisted upon the shipper as a result of the carrier's superior bargaining strength." Complaint of Norfolk, Baltimore & Carolina Line, Inc., 478 F. Supp. 383, 388 (E.D. Va. 1979).  Congress intended, through COGSA, to assist shippers and carriers in understanding risks and protecting their interests.  Id. at 389.

---

[3]See infra note 7 and accompanying text.

[4]The late reply did not contain any new arguments.

With respect to the liability of a carrier of goods, Section 4 of COGSA provides that

> [n]either the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States, or in case of goods not shipped in packages, per customary freight unit, or the equivalent of that sum in other currency, unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading.

46 U.S.C. app. § 1304(5) (emphasis added).  COGSA applies "to all contracts for carriage of goods by sea to or from ports of the United States in foreign trade." Id. § 1312.  The term carriage of goods "covers the period from the time when the goods are loaded on to the time when they are discharged from the ship."  Id. § 1301(e).  COGSA applies to domestic shipments where a bill of lading, or similar document of title that is evidence of a contract, contains an express statement that it shall be subject to the provisions of COGSA.  Id. § 1312.  Thus, COGSA may apply (1) by its own terms ("ex proprio vigore") or (2) by express incorporation in a contract ("ex contractu").

### III.  The Fourth Circuit Rule For Determining Whether Particular Goods Constitute A COGSA Package

This case turns on whether the K-Loader was a package within the meaning of COGSA.   If the K-Loader was a COGSA package, the parties agree that Maersk's liability for damages to the K-Loader was limited to $500.  If not, the parties agree that Maersk's liability for such damages was $500 per customary freight unit, and

the United States' offset of $26,359.30 against amounts due Maersk was proper.  The court must first determine the proper legal rule for determining whether particular goods are COGSA packages.  The court then applies that rule to the undisputed facts of this case.

## A.   The Positions Of The Parties

The United States urges the court to adopt the rule set forth by the United States District Court for the District of Maryland. That court has explained that the elements of a COGSA package are:

> (1) in the course of preparation for transportation or handling,
> (2) by the shipper or shipper's agent (or a predecessor of the shipper),
> (3) the goods are partially or completely covered or contained by the time delivered or entrusted to the custody of the carrier,
> (4) in such a way as to preclude facile identification of the exact character of the goods contained therein or of their condition or quantity (including the condition of any outer covering of, or quantity of, smaller units of goods which have been grouped by the shipper into larger individuated units in the course of preparation for transportation or handling).

Commonwealth Petrochemicals, Inc. v. S/S Puerto Rico, 455 F. Supp. 310, 321 (D. Md. 1978), rev'd on other grounds, 607 F.2d 322 (4th Cir. 1979); see Cincinnati Milacron, Ltd. v. M/V Am. Legend, No. 83-1958, 1984 WL 1471, *1 (D. Md. June 11, 1984) (applying the same test), rev'd on other grounds, 784 F.2d 1161 (4th Cir. 1986).  This test is intended to reflect the plain and ordinary meaning of "package."  Commonwealth Petrochemicals, 455 F. Supp. at 321.  One rationale for this test appears to be that when packaging prevents a carrier from identifying the character of the goods, the carrier

has no direct way of knowing the actual value of the goods it is carrying, unless the shipper expressly declares that value.  See id. at 318.

Maersk correctly notes that in both cases where the District Court for the District of Maryland applied the test cited by the United States, the Fourth Circuit, on appeal, did not reach the issue of whether the goods in question constituted COGSA packages. Thus, the Fourth Circuit has never adopted that test.  Maersk then argues that under Fourth Circuit law "the question of what constitutes a COGSA package is a matter of contract interpretation in which the intent of the parties is the 'overarching standard,' as reflected in the contract of carriage."  Mem. of Law in Supp. of Maersk Line Limited's Mot. for Summ. J. at 10 (Aug. 23, 2006).  In the alternative, Maersk argues that the proper definition of the term "package" is: "a class of cargo, irrespective of size, shape or weight to which some packaging preparation for transportation has been made which facilitates handling, but which does not necessarily conceal or completely enclose the goods."  Id. at 13. Maersk relies on the following two cases in support of its arguments: Caterpillar Overseas, S.A. v. Marine Transp. Inc., 900 F.2d 714 (4th Cir. 1990); and Aluminios Pozuelo, Ltd. v. S.S. Navigator, 407 F.2d 152 (2d Cir. 1968).

In Caterpillar, the Fourth Circuit considered, among other things, the extent of a carrier's liability under COGSA for damages

10

sustained to a tractor.  Caterpillar, 900 F.2d at 716-17.  The shipper had mounted the tractor on a flat rack before delivering it to a sea carrier for transportation to a foreign port.  Id.  The damage occurred while the tractor was being transported over land to a port by a trucker employed by the carrier.  Id. at 716.  In discussing COGSA, the Fourth Circuit cited extensively to Second Circuit decisions.  It noted that the "best definition of 'package' to be distilled from [prior judicial] decisions is 'a class of cargo, irrespective of size, shape or weight to which some packaging preparation for transportation has been made which facilitates handling, but which does not necessarily conceal or completely enclose the goods.'"  Id. at 722 (quoting Aluminios Pozuelo, 407 F.2d at 155).  The court, however, did not have to decide whether the tractor was a COGSA package because the carrier had conceded that it was not a package.  Id.  The court noted that "it might be argued" that the tractor was a package.  Id.

In Caterpillar, the issue before the court was how to define a customary freight unit.  Id.  Under COGSA, for goods not shipped in packages, a carrier's liability for damages is limited to $500 per "customary freight unit."  46 U.S.C. app. § 1304(5).  In determining that a customary freight unit was a single tractor, the Fourth Circuit reasoned that (1) the parties had defined the term "shipping unit" in a long-form bill of lading as a single tractor, and (2) no contrary evidence was offered as to the meaning of the

term.  Caterpillar, 900 F.2d at 723-24.  The court explained that
concluding that a customary freight unit referred to either weight
or measurement "would violate the principle that the intent of the
parties as evidenced by the bill of lading is the overarching
standard for applying the liability limitation of COGSA."  Id. at
724 (internal quotation omitted).

     In Aluminios Pozuelo, another case cited by Maersk, the Second
Circuit considered whether a toggle-press mounted on a skid was a
COGSA package.  407 F.2d at 153.  In that case, a bill of lading
described the toggle-press under the headings "No. OF PKGS" and
"SHIPPER'S DESCRIPTION OF PACKAGES AND GOODS" as "ONE (1) SKID
MACHINERY."  Id.  After reviewing prior judicial decisions, the
court reasoned that the term package refers to "a class of cargo,
irrespective of size, shape or weight, to which some packaging
preparation for transportation has been made which facilitates
handling, but which does not necessarily conceal or completely
enclose the goods."  Id. at 155.  It then concluded that the skid-
mounted toggle-press was a COGSA package because the skid served
"primarily to facilitate delivery so as to make the press an
article . . . suitable for transportation or handling."  Id.  It
further explained that "[h]aving specified that the press was 'ONE
(1)' package," the parties must abide by that meaning with respect
to limitation of liability.  Id. at 156.

The United States raises two issues with respect to the cases cited by Maersk.  First, the United States argues that it "is only when COGSA applies ex contractu that the parties may redefine the term 'package' in their contract."  Where, as here, COGSA applies by its own terms, a carrier may not, therefore, reduce its liability by redefining what constitutes a COGSA package.  The United States' argument is not entirely without merit.  The Fourth Circuit has explained that "[w]e have held that when COGSA does not apply of its own force but is incorporated into a maritime contract by reference, it does not have 'statute rank'; rather, it is merely part of the contract, a term like any other."  Commonwealth Petrochemicals Inc. v. S/S Puerto Rico, 607 F.2d 322, 325 (4th Cir. 1979).  Thus, "when COGSA does not apply Ex proprio vigore, effect should be given to the parties' definition of package even if that definition is contrary to that which would control if COGSA were directly applicable."  Id. (citing Pannell v. United States Lines Co., 263 F.2d 497, 498 (2d Cir. 1959)).  This reasoning implies that where COGSA applies by its own terms, as it does in this case, the parties' ability to define the term "package" is limited.

There are problems, however, with the United States' argument.  This is not a case where the parties have defined the term "package" in a manner contrary to COGSA.  Indeed, they have not defined the term at all.  And even the District Court for the District of Maryland has acknowledged that considering the intent

13

of the parties is appropriate in some cases.  Commonwealth
Petrochemicals, 455 F. Supp. at 321 (noting that "in a given close
case the description of the goods on a bill of lading might be
relevant in determining whether they constitute one or more
packages").  Moreover, in cases such as Caterpillar and Aluminios
Pozuelo, courts have considered the intent of the parties in
interpreting COGSA without considering, at the threshold level,
whether COGSA applies by its own terms or ex contractu.[5]

The second issue raised by the United States is that Maersk,
not the SDDC, put the K-Loaders on the flat racks.  This is an
unusual circumstance because typically the shipper, not the
carrier, would mount cargo on a skid or flat rack.  The Second
Circuit has suggested that this could be a factor in an appropriate
case when determining whether specific goods constitute a COGSA
package.  See Standard Electrica, S. A. v. Hamburg Sudamerikanische
Dampfschiffahrts-Gesellschaft, 375 F.2d 943, 946 (2d Cir. 1967)
(noting that "the shipper and not the carrier" chose to put cartons
on a pallet); see also Complaint of Norfolk, Baltimore & Carolina

---

[5]It is arguable that in Caterpillar, COGSA did not apply by
its own terms because the damage occurred before the goods were
loaded onto the ship.  See 46 U.S.C. app. § 1301(e) (defining
"carriage of goods" to cover "the period from the time when the
goods are loaded on to the time when they are discharged from the
ship"); Caterpillar, 900 F.2d at 716.  But there is no indication
in Aluminios Pozuelo that COGSA applied ex contractu, rather than
by its own terms.  See Aluminios Pozuelo, 407 F.2d at 153-54
(explaining that the issue before the court was whether the skidded
toggle-press was a package within the meaning of COGSA).

Line, Inc., 478 F. Supp. 383, 392 (E.D. Va. 1979) (considering whether the shipper or carrier chose to ship the goods using a container when determining whether that container was a COGSA package).

## B.    This Court's Ruling

The Second Circuit in Aluminios Pozuelo set forth a clear rule to resolve whether particular goods constitute a COGSA package, and the Fourth Circuit adopted the Second Circuit's approach in Caterpillar.  See Caterpillar, 900 F.2d at 722-23; Aluminios Pozuelo, 407 F.2d at 155-56.[6]  Specifically, in Caterpillar, the Fourth Circuit explained that a court must make two considerations in determining whether particular goods constitute COGSA packages. See Caterpillar, 900 F.2d at 722-23.  First, a court should consider whether particular goods fall within the following broad definition of the term package: "'a class of cargo, irrespective of

_____

[6]The Fourth Circuit has consistently followed the Second Circuit when establishing rules for determining whether particular goods constitute a COGSA package.  See, e.g., Universal Leaf Tobacco Co., Inc. v. Companhia De Navegacao Maritima Netumar, 993 F.2d 414, 417 (4th Cir. 1993).  In Universal Leaf, the Fourth Circuit adopted the Second Circuit's bright-line rule that "when a bill of lading discloses on its face what is inside the container, and those contents may reasonably be considered COGSA packages, then the container is not the COGSA package." Id. (citing and adopting Monica Textile Corp. v. S.S. Tana, 952 F.2d 636, 639-42 (2d Cir. 1991)).  This container rule does not apply to the facts of this case, and neither party has so argued, because this case involves a form contract developed by the shipper, rather than a bill of lading.  Also, the K-Loader has not been treated as a container.  See infra at 19-23.  However, Universal Leaf reflects the Fourth Circuit's adoption of the Second Circuit's bright-line rule in this area as set forth in Monica Textile.

size, shape or weight to which some packaging preparation for transportation has been made which facilitates handling, but which does not necessarily conceal or completely enclose the goods.'" Id. at 722 (quoting Aluminios Pozuelo, 407 F.2d at 155).  Next, a court should examine the parties' contract for carriage to determine whether the parties intended the goods to constitute a package.  See id. at 722-23 (explaining that "both the Second Circuit and this Circuit had followed the principle that the term 'package' as defined in the [parties' contract] was the proper construction of that term").  Having considered the arguments of the parties and reviewed the relevant case law, the court deems this two-step analysis the appropriate means for resolving whether the K-Loader constitutes a COGSA package.

Under Caterpillar, the court must first consider whether the K-Loader falls within the following broad definition of the term "package": "cargo . . . to which some packaging preparation for transportation has been made which facilitates handling, but which does not necessarily conceal or completely enclose the goods."  900 F.2d at 722.  In this case, the pictures accompanying the declaration of Nelson show the K-Loader affixed to a flat rack, which supports the K-Loader from below but does not completely enclose the K-Loader.  Nelson Decl. Ex. C; see also Joint Stipulation of Facts ¶ 6 (explaining that the K-Loaders were loaded onto flat racks).  In addition, the SDDC indicated the following in

16

the booking documents: "UNIT PACKAGED TO PREVENT DRIVING ON-OFF VESSEL." Furthermore, the United States has not contested Maersk's assertion that "[t]he use of a flat rack is essential to handling and carrying of heavy vehicles such as the K-Loader involved in this case." Eker Decl. ¶ 4. In light of these uncontested facts, the court concludes as a matter of law that the K-Loader falls within the Fourth Circuit's broad definition of the term "package."

After determining that particular goods fall within the broad definition of the term "package" set forth in Caterpillar, a court must also consider whether the parties intended that the goods at issue constitute a package. See Caterpillar, 900 F.2d at 722-23; Aluminios Pozuelo, 407 F.2d at 156. In this case, Clause 3.1 of the USC-04 provides that "a container shall not be considered one package" for the purpose of limiting a carrier's liability under COGSA. In interpreting Clause 3.1 and the other provisions of the parties' contract, the intent of the parties is the overarching standard. See Caterpillar, 900 F.2d at 723 (interpreting the parties' contract, as evidenced by a bill of lading).

An examination of the USC-04, TCMD, and booking documents reveals that the parties intended the K-Loader to constitute a package. Maersk, through the declaration of Nowotarski, has asserted that the USC-04, TCMD, and booking documents show "that the parties intended each K-Loader, mounted on a flat rack, to be a single packaged unit." Nowotarski Decl. ¶ 12. The references to

17

packages in the various contract documents provide some evidence of the intent of the parties.  See id. ¶¶ 13-14; supra Part I.B.2. More importantly, the SDDC indicated the following in the booking documents: "UNIT PACKAGED TO PREVENT DRIVING ON-OFF VESSEL."  This language shows that the parties contemplated that Maersk would package the K-Loader.

The United States correctly notes that the parties stipulated that Maersk loaded the K-Loaders onto the flat racks.  In another case, this might be a significant factor in determining whether a shipper and carrier intended a particular thing to be a package. In this case, however, the SDDC indicated in the booking documents that the K-Loaders would be packaged, which establishes that the parties intended that Maersk package the K-Loaders.  See United States' Reply to Maersk Line Limited's Op. to United States' Mot. for Summ. J. at 3 (Sept. 14, 2006) (admitting that "the Army knew of Maersk Line's intent to bolt the K-Loader to a flat-rack").

The United States also contends that the best indicator of the intent of the parties is "the calculation of the freight using a customary freight unit."  In this case, Maersk charged the United States for shipping by the measurement ton.  The United States argues that Maersk should, therefore, be liable by the measurement ton.  No support exists for this argument in the case law.  If Congress intended a package and a customary freight unit to refer to the same thing, there would have been no reason to use both

terms in Section 4 of COGSA. A carrier's liability would always be limited to $500 per customary freight unit unless the shipper declared the nature and value of the goods at issue. <u>See</u> 46 U.S.C. app. § 1304(5).

Further, the United States asserted at the September 19, 2006, hearing, <u>for</u> <u>the</u> <u>first</u> <u>time</u>, that certain provisions of the USC-04 show that the parties intended the K-Loader to constitute a container within the meaning of Clause 3.1 of the USC-04.[7] Clause 3.1 of the USC-04 states that "[f]or the purpose of interpreting Section 4 of [COGSA] a container shall not be considered one package. The limitation of liability set out in Section 4 . . . shall apply to each package, and for cargo not in packages to each measurement ton of cargo." Thus, if the K-Loader is a container within the meaning of Clause 3.1, it is not a single COGSA package.

It is clear, however, from the undisputed facts of this case that the parties did not intend the K-Loader to constitute a container within the meaning of Clause 3.1. This court must first

---

[7]The United States failed to raise this argument in any of the three briefs that it filed prior to the September 19, 2006, hearing. Thus, Maersk did not have any meaningful opportunity to consider the argument and develop a response. Maersk filed its motion for summary judgment on August 23, 2006. Under Local Civil Rule 7(F)(1), the United States had eleven days after being served with that motion to respond. The United States waited until September 19, 2006, the day scheduled for the hearing on the summary judgment motions, before raising this argument. Pursuant to this court's Order of September 29, 2006, the parties filed supplemental briefs to address the United States' argument that the K-Loader was a container within the meaning of Clause 3.1.

consider the USC-04 in interpreting the parties' contract. Nowotarski Decl. ¶ 5 (explaining that the parties' contract consisted of the following documents in order of priority: the USC-04; the TCMD; and the booking documents). Clause 3.1 of the USC-04 provides that "a container shall not be considered one package." This clause is ambiguous because the USC-04 uses the term "container" to refer to both a container in and of itself and to container cargo. If the term "container" means simply a container, such as a flat rack container, Clause 3.1 would provide that a container, standing alone, shall not be considered one package. See Webster's Third New International Dictionary 491 (1966) (defining "container" as a "metal compartment in which freight is placed"). This interpretation of Clause 3.1 is plausible because under the USC-04, a contractor has a responsibility to return government-owned containers to the government in the same condition as received. See Nowotarski Decl. Ex. A, at 35. If, for example, an empty container were damaged before being returned to the government, Clause 3.1, under this interpretation, would ensure that the container itself would not be considered one package for the purpose of determining the carrier's liability for those damages under COGSA. If, on the other hand, the term "container" refers to container cargo, Clause 3.1 would mean that such cargo shall not be considered one package. This interpretation of Clause 3.1 is also plausible because the USC-04 defines the term "General

Cargo: Container" to include various types of "container cargo." See Nowotarski Decl. Ex. A, at 50; see also id. at 62 (where the USC-04, under the heading "Container Rates," sets forth freight rates for the shipping of empty containers and container cargo).

Importantly, under either interpretation of Clause 3.1, the K-Loader was not a container. Under the former interpretation of Clause 3.1, the K-Loader would not qualify as a container because, although a flat rack is a type of container, see Nowotarski Decl. Ex. A, at 50, the K-Loader was more than just a flat rack; it was a Halversen aircraft loader affixed to a flat rack. See Joint Stipulation of Facts Not in Dispute ¶¶ 1, 2. Moreover, even under the latter interpretation of Clause 3.1, the K-Loader was not a container because the parties did not intend the K-Loader to constitute container cargo. The USC-04 defines two classes of cargo: breakbulk/RORO cargo and container cargo. For all intents and purposes, the parties treated the K-Loader as breakbulk/RORO cargo, not container cargo. The K-Loader was designated as breakbulk/RORO cargo, not container cargo, in the booking documents. See Nowotarski Decl. ¶ 9; see also id. ¶ 5 (explaining that pursuant to Clause 4.1.8 of the USC-04, the booking documents were part of the parties' contract); id. ¶ 17 (noting that Clause 6.2 of the USC-04 defines breakbulk/RORO cargo as "all cargo that is not containerized"). In addition, the SDDC neither paid freight on a container basis nor paid any of the surcharges that normally

would accompany containerized shipments.  Id. ¶ 17.  Furthermore, the fact that the parties intended the K-Loader to constitute a package, see supra at 17-19, shows, at least to some limited extent, that the parties did not intend the K-Loader to constitute a container because pursuant to Clause 3.1, the K-Loader would not constitute "one package" if it was a "container" within the meaning of that clause.

Thus, although it is not clear from the USC-04, when that document is viewed in isolation, whether the K-Loader was a container within the meaning of Clause 3.1, it is clear from the undisputed facts of this case that the parties did not intend the K-Loader to constitute a container within the meaning of that clause.  See Aluminios Pozuelo, 407 F.2d at 156 (explaining that where the parties define particular cargo to constitute a package, they must abide by that definition in determining limitation of liability).  Accordingly, there is no genuine issue of material fact as to whether the K-Loader constitutes a container within the meaning of Clause 3.1, and it is appropriate to grant summary judgment in favor of Maersk.  See Caterpillar, 900 F.2d at 723 (explaining that the intent of the parties is the "overarching standard" in interpreting a contract); see also Goodman v. Resolution Trust Corp., 7 F.3d 1123, 1126 (4th Cir. 1993) (explaining that where a court determines that a contract is ambiguous, "it may yet examine evidence extrinsic to the contract

that is included in the summary judgment materials, and, if the evidence is, as a matter of law, dispositive of the interpretative issue, grant summary judgment on that basis").

Finally, the court's decision is consistent with the decisions of courts that have addressed the issue of whether a machine, a piece of equipment, or other large object constitutes a COGSA package when attached to a skid, pallet, or flat rack in preparation for shipment. See, e.g., Aluminios Pozuelo, 407 F.2d at 156 (holding that a toggle press attached to a skid was a COGSA package); F.A. Mach. Logistices, Inc. v. M/V JEBEL ALI, No. 498-022, 1998 WL 938589, *2 (S.D. Ga. Sept. 21, 1998) (holding that an "excavator, lashed to a flat rack, is a 'package'"); Z.K. Marine, Inc. v. M/V Archigetis, 776 F. Supp. 1549, 1552, 1555 (S.D. Fla. 1991) (concluding that a yacht strapped to a cradle constituted a COGSA package); Ins. Co. of N. Am. v. M/V XIANG HE, No. 89-0184, 1990 WL 121587, *1-3 (S.D.N.Y. Aug. 15, 1990) (holding that a helicopter secured to a flat rack container, which had neither a top nor sides, was a package). But see Hartford Fire Ins. Co. v. Pac. Far E. Line, Inc., 491 F.2d 960, 965 (9th Cir. 1974) (holding that an "electrical transformer bolted to a wooden skid" was not a package).

This decision is also consistent with the purposes underlying COGSA. This is not a case where a carrier possessed superior bargaining strength sufficient to coerce a shipper's agreement to

an adhesion contract.  The United States contracts with multiple carriers, and has developed form contracts to do so.  Moreover, by adopting a rule that mirrors the Second Circuit's approach, the court is, at least to some extent, assisting shippers and carriers in understanding risks and protecting their interests.  The mere fact that a carrier can view particular goods before shipping them does not necessarily enable the carrier to determine the value of the goods.  The rule adopted in this case will place an incentive on the shipper to declare the value of goods before shipping them. See 46 U.S.C. app. § 1304(5) (explaining that the $500 per package liability limitation does not apply where "the nature and value of such goods have been declared by the shipper before shipment").  When a carrier knows the value of the goods it carries, it can take precautions and protect its interests accordingly.

### IV. Conclusion

This court concludes as a matter of law that the K-Loader was a COGSA package.  The K-Loader falls within the broad definition of the term "package" adopted by the Fourth Circuit in Caterpillar. Moreover, an examination of the parties' contract, which is also required under Caterpillar, reveals that the parties intended the K-Loader to constitute a package.  Furthermore, the parties did not intend the K-Loader to constitute a container within the meaning of Clause 3.1 of the USC-04, which provides that "a container shall not be considered one package."  The court's decision is consistent

24

with the decisions of other courts and the purposes underlying COGSA.

The court **DENIES** the United States' Motion for Summary Judgment and **GRANTS** Maersk's Motion for Summary Judgment. The United States is liable to Maersk for $25,859.30, based on the amount wrongfully withheld by the United States, $26,359.30, less Maersk's actual liability under COGSA of $500. In addition, the court deems an award of prejudgment interest appropriate. Nat'l Shipping Co. of Saudi Arabia (NSCSA) v. Moran Mid-Atl. Corp., 924 F. Supp. 1436, 1454 (E.D. Va. 1996) ("In admiralty cases, computation of an award for prejudgment interest is within the sound discretion of the district court."). The Court, therefore, **DIRECTS** the Clerk to enter judgment for Maersk against the United States in the amount of $25,859.30 plus costs and prejudgment interest at a rate of four (4) percent from December 21, 2005, until the date of the entry of the judgment pursuant to this Opinion and Final Order.[8]

---

[8]Absent an authorizing statute, the United States is not liable for costs or prejudgment interest. Henderson v. United States, 517 U.S. 654, 665 (1996). Congress has provided that in cases arising under admiralty law, "[a] judgment against the United States . . . may include costs and interest at the rate of 4 percent per year until satisfied. Interest shall run as ordered by the court, except that interest is not allowable for the period before the action is filed." Pub. L. No. 109-304 § 3(III), 120 Stat. 1485, 1519 (2006) (to be codified at 46 U.S.C. § 30911); see also id. § 2, 120 Stat. at 1485 (explaining that Public Law 109-304 is intended to codify and clarify ambiguities in existing law). Accordingly, an award of costs and prejudgment interest at a rate of four (4) percent from December 21, 2005, the date this case was

**IT IS SO ORDERED**.


_____
_____/s/_____
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia

October 30, 2006

_____

filed, until the date of judgment is appropriate in this case.